**P. L. SADDLER**

v.

**UNITED STATES.**

No. 202–57.

United States Court of Claims.
March 1, 1961.

Robert F. Murray, Wenatchee, Wash., for plaintiff.

Thomas J. Lydon, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

DURFEE, Judge.

This is a claim for contract damages based on a change order issued by defendant which the plaintiff maintains required work to be done which was outside the scope of the contract. The con-

tract in suit, entered into on April 23, 1951, required the plaintiff to provide the materials and labor necessary for the construction of a levee embankment on the Methow River, near Twisp, Washington. As originally written, it was a unit price contract calling for the placing of estimated quantities of embankment, backfill, and stone riprap. The quantities and unit prices are set out in Finding No. 2. The total contract price was $12,575.

Plaintiff began performing the contract within a few days of its execution and June 8, 1951, was established as the contract completion date. Some of the work called for in the contract had been completed by May 13, 1951, when a severe flood inundated the worksite and forced abandonment of the work until July 11, 1951. It became apparent that a levee built to the specifications called for in plaintiff's contract would be inadequate to withstand a subsequent flood of the same magnitude. It was necessary, therefore, that the levee be redesigned to provide the bank protection intended and desired when the original contract was let. On June 21, 1951, defendant's resident engineer forwarded technical provisions and a revised drawing dated June 18, 1951, which amended the original specifications to provide for changes in length, alignment, and profile of the levee, which changes increased the quantity of earth to be placed. Plaintiff's bid proposal on the new quantities in response to the technical provisions provided for the same unit prices as did the original contract.[1] Instead of the 5,500 cubic yards of embankment estimated in the original contract, the new specifications called for 7,950 yards. Plaintiff's letter accompanying his bid on the new quantities also requested a reasonable adjustment of the unit price for the riprap if he should be required to incur unanticipated exploration costs in locating a site to supply the amounts of stone required by the job specifications.

Plaintiff resumed work on the contract on July 21, 1951. The completion date was extended to September 12 by which date the work was actually completed. During the course of the resumed work a proposed change order, reciting the newly determined amounts of work to be done, was submitted to plaintiff but no action was taken on it by him. On September 1, the defendant was notified that plaintiff was proceeding under protest and had been so operating for three weeks. Notwithstanding his bid proposal in response to the June 18 technical changes, the plaintiff expressed a reluctance to place any materials beyond the quantities called for in the original contract.

The proposed change order was withdrawn and reissued as change order No. 1, dated October 17, 1951. The quantities of materials and unit prices under that change order are set forth in Finding No. 9. It will be seen that 13,264.8 cubic yards of embankment were required under the change. The total contract price under the change order became $17,916.90. The unit prices were the same as in the original schedule but the quantities of materials had been changed. Basically, the change order provided for a slight change in the alignment and profile of the levee and added approximately 735 feet to its original length. The change of alignment required the abandonment of 300 feet of embankment already in place, thus effectively adding over 1,000 feet to the total length of the levee. Plaintiff signed the change order in February 1953 and accepted the final contract payment at that time.

Although the length of the levee was approximately doubled by the change

---

[1]. The technical provisions of June 18, 1951, and plaintiff's bid in response thereto, included the placing of a filter blanket. However, the change order, as finally written, did not include this item and the plaintiff in fact did not perform any work in connection with the filter blanket. Apparently the filter blanket item was deleted by the defendant.

order (including the section abandoned), the total cubic yardage contained in the design as changed was more than doubled. The reduction in quantity of both backfill and riprap, and the change in the total prices for these items was not substantial. However, under the original contract riprap work accounted for approximately 60 percent of the estimated total price while the riprap work after the change order accounted for only 40 percent of the total.

In August 1952, plaintiff filed a claim with the Corps of Engineers contending that the change order constituted a breach of contract entitling him to additional compensation and claiming damages of over $21,000.

The contracting officer denied plaintiff's claim and he appealed that decision to the Corps of Engineers Claims and Appeals Board which determined that the contract had not been breached but that plaintiff would be entitled to an equitable adjustment with respect to the riprap if he had been put to additional expense in obtaining it. The contracting officer again declined to make any adjustment in the contract price and the Claims and Appeals Board sustained him on the ground that plaintiff had not been put to any expense in obtaining the riprap beyond that contemplated at the time the contract was originally entered into.

Plaintiff's claim for damages is premised on the following theory. His original contract was for approximately $12,575. He worked until $12,575 worth of work had been completed on a per unit basis. This occurred on or about August 10, 1951, and it is plaintiff's position that that completed his original contract. All the costs he incurred from that date until the job was completed he claims emanated from the change order.

█ Article 3 of the original contract permits the contracting officer to make changes in the contract specifications provided they are within the general scope of the contract. The plaintiff's theory of damages for contract breach relies on the changed specifications being outside of the scope of the contract. Should changes in the contract which are within its scope have resulted in an increase in the amount of work required, the defendant would have been obligated to make an equitable adjustment in the contract price. However, damages, such as sought by Saddler, can only be recovered where the changes are outside of the scope of the contract and amount to a breach.

█ The Government insists that the change order did not alter the quality, character, nature or type of work contemplated by the contract and, moreover, it was actually designed to achieve the purpose of the contract. Yet it acknowledges that the point at which a change must be considered to be beyond the scope of the contract and inconsistent with the "Changes" article is a matter of degree varying from one contract to another. We think that a determination of the permissive degree of change can only be reached by considering the totality of the change and this requires recourse to its magnitude as well as its quality.

The number of changes is not, in and of itself, the test by which it should be determined whether or not alterations are outside of the scope of a contract. This court decided in Magoba Construction Co. v. United States, 1943, 99 Ct.Cl. 662, that the Government had not breached a construction contract in which it had made 62 separate changes. On the other hand, obviously, a single change which is beyond the scope of a contract may be serious enough to constitute an actionable breach of that contract.

██ In discussing the liability of the Government for ordering a change in a construction contract which eliminated a whole building from a hospital complex and which occasioned a ten percent reduction in the contract price, this court said in General Contracting & Construction Co., Inc. v. United States, 1937, 84 Ct.Cl. 570, 579:

" * * * Certainly the authority vested in the contracting officer by this article of the contract to make 'changes in the drawings and (or) specifications of this contract and within the general scope thereof' did not vest him with the authority to eliminate entirely from the contract Building No. 17. If he could eliminate one building from the contract under the guise of making changes in the drawings and specifications he could likewise eliminate two or any number of buildings and thus entirely change the contract. The elimination of Building No. 17 amounted to a cardinal change or alteration of the contract itself, a thing that could only be consummated with the consent of both parties to the contract. The elimination of Building No. 17 from the work to be performed under the contract without the consent of the plaintiff was a plain breach of the contract by the defendant."

The plaintiff believes that the change which resulted in more than doubling the amount of earth to be placed was a cardinal change in the contract into which he had entered. We must agree with this contention.

The general purpose set forth in the contract was simply to construct a levee "on the right bank of the Methow River, below Twisp, Washington." Certainly if the change in the contract did not affect the nature of the work but required the contractor to levee the entire bank below Twisp, though it might involve miles of dikes, it would seem to be a cardinal change. By the same token the addition or correction of a few feet of embankment cannot be said to be a change which is beyond the scope of the contract. We do not attempt to set forth a mathematical definition by which any deviations in quantity from a contract must be measured. Obviously the differences between contract situations will admit of no such inflexible formula.

However, several elements of the instant fact situation are significant with respect to the seriousness of the change. This was a relatively small contract, perhaps involving a small margin. It was undertaken in order that the contractor might keep his men and equipment busy during the weeks preceding the opening of the summer construction season. Irrespective of the delay caused by the unanticipated flooding, the contract period must have been extended in some measure by the addition of the new work. Furthermore, there is evidence that the redrafted specifications required the contractor to bring back certain equipment to the jobsite, which he had believed was no longer needed, a distance of a hundred miles. Certain qualifying conditions which accompanied plaintiff's response bid on the new specifications apparently were disregarded by the defendant.

Plaintiff can not be said to have waived the impact of the extensive change. His bid on the proposed specification changes in June was a bid on an amount of earthwork only slightly increased over the original estimate, viz., from 5,500 yards to 7,950 yards. It became apparent that he had not intended to make such an offer on an amount of earthwork approaching that ultimately required in the final change order. He reiterated this reluctance to the defendant as it became clear in the beginning of September that the amount of embankment would far exceed the amount estimated in the June specification changes. In view of the contract provision requiring the contractor to perform even if the estimates were not met or were exceeded, the situation might have been different had the variance been within reasonable limits. We think that this provision in this particular contract can not be effective where the variance is so substantial as to amount to a cardinal change. A unit price bid on 7,950 yards of embankment can not be enforced where the amount, under these circumstances, is increased to over 13,000 yards nor can we find a waiver of the change since in June, when he submitted the bid, the plaintiff was given no idea of how extensive the change was to be.

We are of the opinion that the nature of this particular contract was so

changed by the added work, albeit the same kind of work described in the original specifications, as to amount to a cardinal alteration falling outside of the scope of the contract. Some of the reasons which compel us to decide as we do about the character of the change are also pertinent to the problem of damages. But that question is complicated by the fact that plaintiff's original books and records were lost or destroyed during a move in his business operations from Washington to California. The plaintiff's claim was submitted to audit at the direction of the Trial Commissioner but the defendant was unable to accomplish the audit because of the skeletal character of plaintiff's documentary evidence. We are satisfied that the original documentation relating to plaintiff's additional expenses was lost in the manner described. The documentation which he has introduced into evidence consists of an itemized accounting of expenditures prepared from the original vouchers by his bookkeeper at the time the expenses were paid. The additional expenses claimed as damages include costs of labor, travel, equipment rental, equipment transportation, engineering work and supplies. We are of the opinion that not all of these items are properly attributable to the changes which the defendant required.

The cost of moving tractors, scrapers, and compressor from Wenatchee to Twisp, Washington and return during the month of May would appear to be expenses which would properly have been incurred regardless of the changed specifications. However, plaintiff's evidence indicates that certain equipment was removed from the jobsite at about the time work was stopped due to high water because that particular equipment was no longer needed. Following the change order, the evidence continues, it was necessary to bring some pieces of equipment back to the job. This would have occurred in July or later and as clearly as we can ascertain the only kinds of equipment so required were tractors and scrapers. The remaining major equipment which was moved after July, according to plaintiff's records, was shovels apparently for use in obtaining the stone riprap, an item of work not increased by the change order. It appears that the only equipment transportation charge clearly attributable to the change is that connected with the return of tractors and scrapers from Wenatchee to Twisp, in July or later. There was only one of each machine so moved, the combined roundtrip expenses totaling $744.52. Plaintiff's formula for arriving at his equipment transportation charges is to take his transportation costs for the entire contract period and halve it. Such procedure has no relationship to the actual facts of the situation.

The entire amount claimed for supplies must be disallowed. It consists of expenditures for blasting powder, equipment maintenance, and incidentals, like lumber and safety hats. The powder was utilized, of course, in breaking up the stone riprap, an operation which, as we have previously noted, would have to have been performed under the contract as originally written. Gas, oil, equipment repairs, and the like, presumably were covered by the rental rates expended by plaintiff on the hired equipment; consequently, those charges cannot be recovered a second time as supplies.

■ The evidence is that the labor, travel, and engineering expenses appearing in plaintiff's evidentiary records were chargeable to the change order and, hence, they may be recovered. These items amounted to $3,762.35, $109, and $947.03, respectively.

■ The expenses for equipment rental must be treated like those for equipment transportation. Part of the claim must be disallowed since certain pieces of equipment would have been needed to perform those portions of the work not affected by the change. The rental expenses on so much of the equipment as could have been necessitated by

the additional embankment work amounted to $5,231.17.

Adding together the expenses for equipment transportation; labor, including a ten percent payroll expense; equipment rentals; travel and engineering costs a figure of $11,170.31 is arrived at. To this must be added ten percent which we think is reasonable for overhead; from it must be deducted the final payment of $6,181.90, accepted after the administrative claim had been filed. Accordingly, the amount of damages occasioned by the defendant's breach is $6,105.44 and the plaintiff is entitled to recover that amount.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and WHITAKER, Judges, concur.