R & W FLAMMANN GmbH, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 02–800C.

United States Court of Federal Claims.

Filed Under Seal: Aug. 28, 2002.

Published: Sept. 23, 2002 [1].

1. Pursuant to the court's August 19, 2002 protective order, this opinion was originally filed under seal on August 28, 2002. The parties were given an opportunity, by order of same date, to file notices with the court advising whether any portions of the opinion should be redacted. No such redactions were submitted, therefore the opinion is published in its original form excepting one minor correction (for which an Erratum was issued on September 20, 2002) not affecting the merits herein.

**648**

John R. Keys, Jr., Washington, D.C., attorney of record for plaintiff.

Allison A. Page, Washington, D.C., with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant.

## OPINION

REGINALD W. GIBSON, Senior Judge.

### INTRODUCTION

Plaintiff, the incumbent contractor (DAJA02–01–D–0007), filed a pre-award bid protest alleging that defendant, the Army, after deciding *not* to exercise the option under an existing service contract, *supra*, released plaintiff's unit prices for the current and future (option) years to its competitor, SKE GmbH, to its detriment. Both plaintiff and SKE are presently competing under a "new" solicitation (DAJA02–02–B–0001) of a substantially similar contract where plaintiff alleges that it is now prejudiced under the subject solicitation due to the prior release of its unit prices.

Before the court are cross-motions for summary judgement, based upon the administrative record, pursuant to RCFC 56.1. Having considered the entire administrative record, and following oral argument, we find that the Army's decision to release plaintiff's unit prices to SKE only was not, on this record, in accordance with law/regulation. Plaintiff was prejudiced by defendant's unfair and unlawful acts, thus the court grants

plaintiff's motion and denies defendant's motion. For the foregoing reasons, as well as those ventilated below, the injunctive relief sought by the plaintiff is also hereby granted.

### PROCEDURAL POSTURE

Plaintiff initially filed a TRO motion, and a preliminary and permanent injunction claim in this court, on July 18, 2002, to preclude defendant from receiving and opening any bids, and from awarding a contract under the current *re-solicitation*. At the July 23, 2002 pre-motion hearing in open court, defendant initially agreed to abstain from opening any bids and awarding any contract under Solicitation No. DAJA02–02–B–0001 until August 26, 2002. In response thereto, plaintiff withdrew its TRO motion, and the parties expressed their intent to file respective motions for summary judgment based upon the administrative record pursuant to RCFC 56.1. Defendant filed the administrative record with the court on July 29, 2002. A motion to supplement said record was filed by plaintiff on August 1, 2002, which was granted on August 7, 2002 over defendant's opposition. The parties filed cross-motions for summary judgment based upon the administrative record on August 13, 2002, reply briefs on August 16, 2002, and oral argument was heard in open court on August 19, 2002.[2]

### JURISDICTION

Pursuant to 28 U.S.C. § 1491, the Court of Federal Claims has jurisdiction to hear pre-award bid protest claims of interested parties,[3] and "may award any relief that the court [deems just and] proper, including [but not limited to] declaratory and injunctive relief." 28 U.S.C. § 1491(b)(2).

### FACTUAL BACKGROUND

Plaintiff, R & W Flammann GmbH ("Flammann"), is the *incumbent* contractor who, on January 8, 2001, was awarded contract No. DAJA02–01–D–0007 to provide "between occupancy maintenance" ("BOM") services for U.S. Government Housing facilities in Heidelberg, Germany. Defendant is the

---

**2.** At the close of oral argument, defendant further agreed to abstain from bid opening and contract award, pursuant to the subject solicitation, until August 29, 2002.

**3.** An interested party is defined as an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2).

U.S. Department of the Army, Regional Contracting Office, Seckenheim (at Manheim), Germany ("Army"). BOM services under the plaintiff's incumbent contract included carpentry, electrical, sanitation, interior painting, cleaning, stairwell maintenance, and floor repair, among other things. The incumbent contract was awarded for one base year with four (4) one-year options, beginning February 1, 2001 through January 31, 2006. That contract was awarded to plaintiff as the lowest-priced responsive bidder under a sealed bid solicitation pursuant to 48 CFR Subpart 14.1.

As early as October 2001, defendant expressed that it would *not* exercise the first-year option under the incumbent contract,

4. Defendant disagrees that the current solicitation is a *re-solicitation*. Def. Counter Stmt. of Facts at 3. Instead, defendant characterizes it as a "new" solicitation. Def. Reply at 8. To the extent that defendant is in fact soliciting for BOM services for the U.S. Government Housing facilities at Heidelberg, Germany, as was the case in the incumbent contract, the current solicitation *is* a re-solicitation.

5. AR = Administrative Record; SAR = Supplement to Administrative Record.

6. The parties are apart on this fact, that is, the degree of similarity between the Statement of Work in the incumbent contract and that of the current solicitation. Plaintiff claims that some 87.5% of the CLINs of the two contracts "correspond directly." Pl. Stmt. of Facts at 15. Defendant counters that the contracts are "extremely different" due to (*inter alia*): (1) the change in the contract type from a requirements-type to an indefinite delivery-type, and (2) the addition of one (1) English speaking person to each crew; both of which will effect line-item costs. Hrg. Tr. 69:21–22 (Aug. 19, 2002); Def. Reply at 8–9.

While those facts may be probative, they are not material to the outcome of this case. The court's decision does not turn on the precise similarities (or differences, for that matter) between the contracts, but rather on the germane issue of *fundamental fairness* in the procurement process.

7. It is well settled that defendant may exercise its options at *its* discretion, *Government Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 813 (Fed.Cir.1988), and that there is a (rebuttable) presumption of "good faith" when government agents discharge their duties. *Kalvar Corp., Inc. v. United States*, 211 Ct.Cl. 192, 198, 543 F.2d 1298 (1976). In order to overcome the "good faith" presumption of an optionee, a plaintiff must show "well-nigh irrefragable proof" of

but instead would issue a re-solicitation.[4] Defendant later informed plaintiff (by letter dated October 30, 2001) that performance under the incumbent contract was not a factor in its re-solicitation decision, and plaintiff would be invited to compete for the new contract. SAR 953.[5] Plaintiff is in fact competing for the new contract and has observed by the Statement of Work that the re-solicitation is substantially similar to its incumbent contract.[6] To date, defendant has failed to provide plaintiff with a coherent explanation why it chose *not* to exercise its option,[7] whereas here plaintiff's performance was *not* unsatisfactory.

Instead, utilizing two-step sealed bidding,[8] defendant first issued a Request for Techni-

"some specific intent to injure plaintiff." *Id.* at 198–99, 543 F.2d 1298.

Plaintiff, at the July 23, 2002 pre-motion hearing, averred a vague inference that there may have been a modicum of bad faith on the part of defendant in its failure to exercise option year one. Hrg. Tr. 24:15–17, 25:1–25 (Mr. Keys: "[M]y understanding is that there's a director of housing that preferred to have another contractor in there."); SAR at 954–955 (November 12, 2001 letter from Flammann to Contracting Officer, Vincent Marsh, stating: "There must be some rational basis for the decision not to option our contract.... [Y]our staff have [sic] told us that all predecessor contractors on this contract—including, of course, All Star which was the immediate predecessor—were optioned so long as the work was satisfactory and the pricing in the option period could be considered competitive and acceptable."). (Flammann also informed the court in its Statement of Facts filed on August 13, 2002, that "[o]n July 30, 2002, the Agency awarded a contract to All Star Maintenance GmbH covering cleaning of government housing units and operation and maintenance of the Self Help Store for the base period August 1 through August 31, 2002, with four subsequent option months." Pl. Stmt. of Facts at 18.)

Recognizing what the court believed to be plaintiff's subtle inferences, the court made further inquiry to ascertain whether plaintiff would pursue such argument, allowing plaintiff the opportunity to embellish the record with both documentary evidence and oral testimony. Plaintiff did supplement the record with documentary evidence, albeit only in support of its competitive harm claim. Consequently, plaintiff never developed any argument in the record before the court to overcome the presumption of good faith on the part of the government.

8. Under two-step sealed bidding, "[s]tep one consists of the request for, submission, evaluation

cal Proposal No. DAJA02–02–R–7001 on October 5, 2001, for the performance of BOM services for U.S. Government Housing facilities at Heidelberg. As a direct response thereto, SKE GmbH ("SKE") submitted a Freedom of Information Act ("FOIA") request to the Army to obtain a copy of plaintiff's contract, to wit, DAJA02–01–D–0007, inclusive of "the current cost schedule contained in the 'Supplies or Services and Price/Costs' section."[9] AR at 286, 294. Flammann was notified by letter dated November 20, 2001, of SKE's FOIA request, to which plaintiff warmly objected. AR at 389; Pl. Comp. at Exhibit 4. Several letters were exchanged between the Army's FOIA Coordinator, Rhonda Dennis, and Flammann's then attorney Reed von Maur, each opposing the other's viewpoint as to the propriety of the release of plaintiff's unit prices. AR at 425, 427–28, 433–35, 437–42; SAR at 959. In the end, on or about April 16, 2002, the Army chose to release all of plaintiff's prices for the 2001 base year under contract performance as well as the four (4) *unexercised* (future) option years, covering 2002 through 2006. AR at 462, 464, 466, 487; SAR at 962, 970–72.

On July 2, 2002, the Army issued Invitation for Bids ("IFB"), Solicitation No. DAJA02–02–B–0001 (step-two), which is substantially similar to the incumbent contract and the option years therein (covering the

period of August 1, 2002 through July 31, 2007). Flammann timely filed a protest with the Contracting Officer, Victor Marsh, on July 10, 2002, alerting the agency, *inter alia*, that it has been competitively disadvantaged by the release of its unit prices; whereupon the agency dismissed said protest in a decision letter dated July 15, 2002, deferring to the agency's FOIA determination. AR at 882–893, 900–903. The Contracting Officer's decision was then affirmed by Army Colonel Timothy Pendolino, Independent Protest Review Official at the Headquarters of the U.S. Army Contracting Command, Europe, July 16, 2002. AR at 906–907. Subsequently, plaintiff's injunctive relief sought in this court commenced on July 18, 2002.[10]

## STANDARD OF REVIEW

### Administrative Record

Actions brought under the court's bid protest jurisdiction must be reviewed pursuant to the standards set forth in the APA, 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4); *Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 339, 341 (1997). An agency's decision, therefore, is to be set aside *only* if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). In making these determinations, a reviewing court is to assess whether the agency's decision was "based on a consideration of the relevant factors and

and (if necessary) discussion of a technical proposal. No pricing is involved." 48 CFR § 14.501(a). Next, "[s]tep two involves the submission of sealed priced bids by those who submitted acceptable technical proposals in step one." 48 CFR § 14.501(b).

9. Said cost schedule includes some 360 CLINs for the unit pricing of the current *and* future option years. SKE sent two request letters dated October 9, 2001 and November 5, 2001.

10. On or about July 28, 2002, the contracting officer received a letter from Facilma Gmbh, a successful step-one bidder under the current solicitation, containing the following:

"Now we have been informed, and it should be undisputed, that the RCO Seckenheim has officially released all unit prices of the present contractor at least to one of our competitors. This situation violates all applicable German and European contracting rules as well as the ethics of a fair competition.

Since there is only a minor difference at three CLINs between the present contract and the new solicitation, the availability of unit prices allows an easy estimating of the entire CLINs and underbidding for even of [sic] most out-year prices of this solicitation. Any fair and independent development of [sic] own prices, as required by applicable German and U.S. contract regulations, is not possible anymore. *It may leave the impression that the sole purpose of the subject solicitation is the underbidding of the current contract unit prices.*

\*    \*    \*    \*    \*    \*

It is now our conclusion that this solicitation is simply unfair and does not follow any common rules for public contracting. *Therefore, we will not submit a Price Offer as requested under step 2 of subject solicitation. We hereby withdraw our Technical Proposal. . . .*

However, if the Government decides to resolicit this under fair, competitive conditions we will be pleased to provide you our best offer possible."

SAR at 913–914 (emphasis added).

whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). While "this inquiry into the facts is to be searching and careful, the ultimate standard of review is [ ] narrow." *Id.* That is to say, the court's review of the agency's action is, generally, limited to the administrative record.[11] *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

Where an agency's decision is found to be reasonable, a court may not substitute its own judgment for that of the agency. *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. 814. But where the agency's finding cannot be sustained on the administrative record, the agency's decision must be set aside. *See* 5 U.S.C. § 706(2)(A). Because it is well-settled that procurement officials are entitled to broad discretion in the evaluation of bids and in the application of procurement regulations, the plaintiff bears a heavy burden of showing, by clear and convincing evidence, either that (1) the agency's decision-making process lacked a rational or reasonable basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations. *Day & Zimmermann Services, A Division of Day & Zimmermann, Inc. v. United States*, 38 Fed.Cl. 591, 597 (1997) (citations omitted).

Additionally, minor errors or irregularities, *i.e.*, harmless errors, committed in the course of the procurement process are not sufficient grounds to warrant judicial intrusion to upset a procurement decision. *Id.* (citing 5 U.S.C. § 706(2)) (court must take into account the rule of prejudicial error). In order to establish a prejudicial error, a protestor is not required to show that but for the alleged error, the protestor would have been awarded the contract. *Id.* (citations omitted). Instead, a protestor need only show that, had it

not been for the alleged error, there was a reasonable likelihood that it would have been awarded the contract. *Id.* (citations omitted).

*Summary Judgment*

This court treats motions for summary judgment based upon the administrative record under RCFC 56.1, the same as motions for summary judgment pursuant to RCFC 56. *Nickerson v. United States*, 35 Fed. Cl. 581, 588 (1996), *aff'd*, 113 F.3d 1255 (Fed.Cir. 1997). Summary judgment is proper when there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Substantive law identifies which facts are material; such that, only those operative facts that could affect the outcome of a suit can properly preclude summary judgment. *Id.* at 248, 106 S.Ct. 2505.

It is well established in this court that a motion for judgment based upon the administrative record "is an appropriate vehicle to scrutinize an agency's procurement actions because the issues are [usually] matters of contractual and regulatory interpretation."[12] Therefore, the court may properly grant summary judgment upon its circumscribed review under the APA, *supra*, if no genuine issues of material fact are present, and the movant is entitled to summary judgment as a matter of law.

## CONTENTIONS OF THE PARTIES

*Plaintiff*

Plaintiff contends that the Army acted arbitrarily, capriciously or otherwise not in accordance with law when it released Flammann's current and future unit prices to a competitor, because said prices were confidential commercial information pursuant to Exemption 4 of FOIA[13] and the Trade Se-

---

11. However, under certain circumstances, a court may deem it to be appropriate to embellish the record by permitting the parties to conduct limited discovery and/or adduce additional evidence from the stand in open court. *See Cubic*, 37 Fed.Cl. at 342–43; RCFC 56.1.

12. *Bean Stuyvesant, L.L.C. v. United States*, 48 Fed.Cl. 303, 319 (2000) (citing *Analytical & Research Tech., Inc. v. United States*, 39 Fed.Cl. 34,

43 (1997) (citations omitted); *Chas. H. Tompkins Co. v. United States*, 43 Fed.Cl. 716, 719 (1999)).

13. Exemption 4 provides that the general disclosure provision of FOIA does not apply to matters that are—"trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4).

crets Act ("TSA"),[14] and were thereby exempt from public disclosure. To a lessor degree, plaintiff also alleged that defendant violated Article 47 of the NATO treaty as well as German procurement law. Pl. Mot. at 26–28.

Plaintiff argued that under the *National Parks* [15] test it would suffer substantial competitive harm in the re-solicitation for a new contract covering largely the same time period and scope of work because it would be forced to "ratchet down" its prices, and/or otherwise could be underbid by its competitor. Flammann therefore averred that it was harmed and prejudiced by defendant's unlawful action, hence it is entitled to injunctive relief under the current "tainted" solicitation.

*Defendant*

To plaintiff's foregoing allegations, defendant argues: (1) FOIA and TSA are not procurement statutes or regulations, and to that end, plaintiff has not made any such allegation of violation of a procurement regulation, (2) even if FOIA and TSA could be considered relational to procurement, the Army acted within FOIA, and (3) plaintiff is in no way disadvantaged by disclosure of "historical contract" information because (i)

the entire contract has been in the public domain since the day of bid opening pursuant to 48 CFR § 14.402,[16] and (ii) the prior contract and the current solicitation are "extremely different," requiring new and different cost considerations.

MERITS

We find defendant's answer that plaintiff "has made no allegation that the Army violated a procurement statute," to be a bit of a "red herring" since that in no way precludes the court from considering the matter before it. Although plaintiff asserts (Exemption 4 of) FOIA and the Trade Secrets Act as the basis for its claim, the court also *sua sponte* takes judicial notice of the fact that FOIA *is* incorporated in Federal Procurement Regulations ("FAR") at Subpart 24.2.[17] Furthermore, the D.C. Circuit has held that the "[Trade Secrets] Act is at least coextensive with that of Exemption 4 of FOIA." *CNA Financial Corp. v. Donovan,* 830 F.2d 1132, 1151 (D.C.Cir.1987). "Consequently, whenever a party succeeds in demonstrating that its materials fall within Exemption 4 [of FOIA], the government is precluded from releasing the information by virtue of the Trade Secrets Act." *McDonnell Douglas Corp. v. Widnall,* 57 F.3d 1162, 1164

---

**14.** *Trade Secrets Act, 18 U.S.C. § 1905. Disclosure of confidential information generally.*

"Whoever, being an officer or employee of the United States, ... publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties ... or record made to or filed with, such department or agency or officer or employee thereof, which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential status, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association; ... shall be fined under this title, or imprisoned not more than one year, or both; and shall be removed from office or employment."

**15.** *National Parks and Conservation Assoc. v. Morton,* 498 F.2d 765 (D.C.Cir.1974).

**16.** 48 CFR § 14.402(a) provides in pertinent part:

"The bid opening officer shall decide when the time set for opening bids has arrived and shall inform those present of that decision. The officer shall then (1) personally and publicly

open all bids received before that time, (2) if practical, read the bids aloud to the persons present, and (3) have the bids recorded."

**17.** *FAR Subpart 24.2—Freedom of Information Act*

"24.201 Authority. The Freedom of Information Act (5 U.S.C. 552, as amended) provides that information is to be made available to the public either by (a) publication in the FEDERAL REGISTER; (b) providing an opportunity to read and copy records at convenient locations; or (c) upon request, providing a copy of a reasonably described record."

"24.203 Policy.... (b) Contracting officers may receive requests for records that may be exempted from mandatory public disclosure. The exemptions most often applicable are those relating to classified information, to trade secrets and confidential commercial or financial information .... Since these requests often involve complex issues requiring an in-depth knowledge of a large and increasing body of court rulings and policy guidance, contracting officers are cautioned to comply with the implementing regulations of their agency and to obtain necessary guidance from the agency officials having Freedom of Information Act responsibility."

(D.C.Cir.1995). Thus, the court is satisfied by the foregoing that plaintiff has adequately pleaded its cause of action.

We now turn to defendant's next contention that "even if this Court considers the FOIA disclosure sufficiently related to this procurement, the Army acted properly within FOIA's requirements." Def. Motion at 7.

■ Flammann has relied largely on the case *McDonnell Douglas Corp. v. NASA*, 180 F.3d 303 (D.C.Cir.1999), and its application of the *National Parks'* two-part test. In *National Parks*, the court set out a two-part test to determine what constitutes "confidential" information within the meaning of Exemption 4 of FOIA, to wit, (1) it must be information that "would customarily not be released to the public by the person from whom it was obtained," *id.* at 766, and (2) the likelihood, upon release, to cause substantial competitive harm to the person who supplied it. *Id.* at 771. The information that the appellant in *National Parks* sought to obtain from the Department of the Interior was audited financial records, and the like, of companies operating concession stands in national parks. While the *National Parks* court found facts sufficient to satisfy the first part of the test, *id.*, it remanded the case back to the district court to make a finding as to part two, stating: "If the district court finds in the affirmative, then the information is 'confidential' within the meaning of section 552(b)(4) and exempt from disclosure." *Id.*

■ In *McDonnell Douglas*, the plaintiff was seeking to protect the unit prices that it submitted to NASA under a satellite launch services contract. The contract was a negotiated procurement whereby, among other things, the parties agreed to "eliminate a clause stating that pricing information in the contract was considered to be in the public domain." *McDonnell Douglas*, 180 F.3d at 304. Upon applying the two-part test, the D.C. Circuit found that the information was confidential within the meaning of section 552(b)(4) because the information was not in the public domain, and the plaintiff successfully argued that the release thereof "would permit its commercial customers to bargain down ('ratchet down') its prices more effectively, and it would help its domestic and international competitors to underbid it," therefore, disclosure was likely to cause substantial competitive harm. *Id.* at 306.

Clearly the decision in that case turned on the finding of both nonpublic disclosure and a showing of potential competitive harm. Undoubtedly, "where the Government has obligated itself in good faith not to disclose documents or information which it receives, it should be able to honor such obligations." [18] This court, therefore, must agree with the defendant that the *McDonnell Douglas* case is inapposite to the case at bar, because the holding in that case applies to confidential *undisclosed* information in the hands of the government. *McDonnell Douglas*, 180 F.3d at 304. Whereas here, it is undisputed that sealed bids upon bid opening become publicly available, as did Flammann's incumbent contract, on or about January 8, 2001.[19] For that reason alone, plaintiff's unit prices do not fit within Exemption 4 of FOIA, because publicly available information cannot meet part one of the *National Parks* "confidential" standard. *See CNA Financial Corp.*, 830 F.2d at 1154 (stating that "[t]o the extent that any data requested under FOIA are in the public domain, the submitter is unable to make any claim to confidentiality-a *sine qua non* of Exemption 4.") [20] (Citation omitted).

---

18. *National Parks*, 498 F.2d at 768.

19. "The purpose of public opening of bids for public contracts is to protect both the public interest and bidders against any form of fraud, favoritism or partiality and such openings should be conducted to leave no room for any suspicion of irregularity." *Computer Network Corp.*, 55 Comp. Gen. 445 (B–183639), 75–2 CPD ¶ 297, 1975 WL 11640.

Although Controller General decisions are not controlling, courts have recognized their instructiveness. *Professional Bldg. Concepts, Inc. v. City*

of *Central Falls*, 974 F.2d 1, 3 (1st Cir.1992) (citing *Keco Industries, Inc. v. Laird*, 318 F.Supp. 1361, 1363 (D.D.C.1970)).

20. Bidders are flatly precluded from protecting information submitted through sealed bids as propriety information. *Warner Laboratories, Inc.*, Comp. Gen. Dec. B–189502, 77–2 CPD P 314, 1977 WL 11968, 1977 U.S. Comp. Gen. LEXIS 1952 plainly explicates the inherent incompatibility between FOIA Exemption 4 and a sealed bid procurement such that any attempt to restrict full and open public scrutiny of informa-

Once sealed bids are opened, all members of the public including competitors have the "right to inspect the bids from that day on." *Professional Bldg. Concepts, Inc.*, 974 F.2d at 4. The public availability of *all* information contained in such bids logically nullifies any prospect of a confidentiality exemption. Where FAR Part 14 makes this information public, FOIA then becomes the mere vehicle through which that public information may be distributed. *See, e.g., ECDC Environmental, L.C. v. United States*, 40 Fed.Cl. 236, 238 (1998) (where the parties to a sealed bid protest each made unimpeded FOIA requests of one another's bids just days after bid opening).

Moreover, at least two circuit courts have ruled that unit price information does not fall under TSA because overhead, profit margin, and other cost multipliers cannot be derived from unit prices. *See Acumenics Research & Technology v. U.S. Dept. of Justice*, 843 F.2d 800, 808 (4th Cir.1988) (agreeing with the district court that: "there are too many unascertainable variables in the unit price calculation for a competitor to derive accurately Acumenics' multiplier"); *Pacific Architects and Engineers, Inc. v. U.S. Dept. of State*, 906 F.2d 1345, 1348 (9th Cir.1990).

Given the foregoing, we find that plaintiff's unit prices were *generally* subject to release under FOIA. However, where plaintiff inquires here—whether defendant acted arbitrarily, capriciously, or otherwise not in accordance with law when it released the subject unit prices under Exemption 4 of FOIA and TSA—*under the peculiar facts at bar*, we must answer plaintiff's question in the affirmative. The court's examination of the operative facts cannot and does not end here. Defendant's position that the incumbent contract and the prices released with respect thereto have no bearing on the *current* solicitation *clearly* strains credulity.

The goal of an open, unbiased and impartial competition applies to each and every stage of the procurement process. Public accessibility is a shield, not a sword; that is, public access serves to guard against impropriety and should not therefore be used to create the very thing it was designed to prevent. The public procurement contracting officer has been charged with the unwavering duty and responsibility pursuant to 48 CFR § 1.602–2 of "safeguarding the interests of the United States in its contractual relationships;" and, most importantly, to "[e]nsure that contractors receive impartial, fair, and equitable treatment." 48 CFR § 1.602–2(b). That includes, but is not limited to, taking necessary steps to obviate even the *appearance of impropriety. NKF Engineering, Inc. v. United States*, 805 F.2d 372, 377 (Fed.Cir.1986).

In *NKF Engineering*, the plaintiff, a disqualified bidder, argued that "neither the terms of the solicitation nor any regulation or statute authorize its disqualification 'to protect the integrity of the procurement process from the appearance of and the potential for an unfair competitive advantage.' " *Id.* The Claims Court responded as follows:

"Despite the seeming absence of any authority expressly authorizing the actions that were taken in this case the court is of the view that the contracting officer's responsibility of 'safeguarding the interests of the United States in its contractual relationships', 48 C.F.R. § 1.602–2 (1985), is sufficient to support the exercise of authority that was asserted. What persuades us to this view is the latitude the courts have historically shown with respect to the contracting officer's basic authority to enter into, administer, or terminate contracts, *see, e.g., Arthur Venneri Co. v. United States*, 180 Ct.Cl. 920, 924–25, 381 F.2d 748, 750 (1967); *Sperry Flight Systems Division v. United States*, 212 Ct.Cl. 329, 339–40, 548 F.2d 915, 921 (1977), and the overriding importance of the Government's need to insure full and fair competition in the conduct of its procurements. A procurement system powerless to rid itself of an unfair competitive advantage gained through inside information would soon lose every vestige of competitiveness. There can be no question, therefore, that the

tion pertaining to "the essential nature and type of products offered or those elements of the bid relating to quantity, price and delivery terms"

amounts to a nonresponsive bid that must be rejected.

contracting officer had authority to act upon his concerns and, in an appropriate case, to cause disqualification of a bidder." *NKF Engineering*, 805 F.2d at 377. The Federal Circuit fully embraced the foregoing reasoning of the Claims Court. *Id.* Although that case involved a conflict of interest matter, a finding of an appearance of impropriety "depend[s] upon the [fact] circumstances in each case." *Id.* at 376.

With respect to the case at bar, the court is compelled to identify what it considers to be the ten (10) highly probative facts: (1) In January 2001, Flammann, SKE, and others bid for the now incumbent contract (DAJA02–01–D–0007), to be awarded to the lowest responsive bidder (for a base year with 4 option years); (2) Flammann is awarded the contract (as the lowest bidder), and commences contract performance in February 2001; (3) the Army decides *not* to exercise the year 1 option (in October 2001) and re-solicits substantially the same contract (via the current solicitation, DAJA02–02–B–0001) for another base year with four (4) option-years, again to be awarded to the lowest bidder; (4) In October and November 2001, and following the conduct in paragraph 3, *supra*, SKE, for the express purposes of bidding in the current solicitation, requests from the Army Flammann's current and future (unexercised) option prices under the existing contract (pursuant to FOIA); (5) the Army complies with the FOIA request over Flammann's vigorous objections on or about April 16, 2002; (6) Under the current solicitation, SKE was considered acceptable under step-one of the request for technical proposals, and has presumably proceeded to the price-bidding phase under step-two; (7) the Army invited Flammann to participate in the current solicitation, which it has done, it too progressing to step-two; (8) Notwithstanding Flammann's participation in the current solicitation, it has continually argued that it has been grievously competitively disadvantaged thereunder by the timing of the release of its unit prices to SKE; (9) The Army's answer to Flammann is that the incumbent contract is only "historical information," and therefore is unrelated to the current, new and different solicitation; and (10) Facilma, a technically qualified bidder, *withdrew* from the current solicitation competition due to its perception that the release of Flammann's unit prices for purposes of the current solicitation is fundamentally "unfair and does not follow any common rules for public contracting." See note 10, *supra*.

Under these peculiar factual circumstances, and to "ensure [that] the contractors receive impartial, fair and equitable treatment," the contracting officer had a duty to preclude any and all access to plaintiff's pricing information under its control, particularly that of the future unperformed option years. That there is here the *appearance of impropriety* by the release of plaintiff's unit prices to SKE, only, and no other bidders, is irrefutable as corroborated by the language in Facilma's letter that: *"It may leave the impression that the sole purpose of the subject solicitation is the underbidding of the current contract unit prices."* Plaintiff's contention (by this lawsuit) that it will be harmed clearly goes to an appearance or perception of impropriety. Defendant therefore was duty-bound by FAR section 1.602 *not* to release the incumbent unit prices on these facts, *i.e.*, in the face of an imminent re-solicitation of a substantially similar contract covering largely the same period as those prices to be released on unperformed option years. Defendant argues that the incumbent contract and the prospective contract are "extremely different." This is not so, and the court does not weigh the effects of the differences other than to observe and find that, on the face of the solicitation, the Statements of Work are, in fact, substantially similar in most, if not all, material particulars.

The *NKF Engineering* court was concerned only with the *appearance* of impropriety, not whether there was an actual impropriety, such that even an otherwise legally allowable FOIA release can appear to bestow an unfair competitive advantage on the recipient.[21] *NKF Engineering*, 805

**21.** *See also KPMG Peat Marwick*, Comp. Gen. B–251902.3, Nov. 8, 1993, 93–2 CPD 272, 1993 WL 476704, *aff'd, Agency for Int'l Dev., Development Alternatives, Inc.*—Recon., B–251902.4, B–

F.2d at 379 ("Under the circumstances of this acquisition, it is not possible to make award to NKF without causing such an appearance. Award to NKF would seriously harm the integrity of the competitive system because of the strong appearance of impropriety.").

Such an application apparently is not contrary to the public access requirement of 48 CFR § 14.402(c), where "[e]xamination of bids by interested persons shall be permitted *if it does not interfere unduly with the conduct of Government business,*" that is to say, if public access does not unduly interfere with the prime directive of the contracting officer which is to "[e]nsure that contractors receive impartial, fair, and equitable treatment." Under these unique facts, and only during the running of the current solicitation, any such distribution of plaintiff's unit prices, particularly with respect to the unperformed option years, would in fact interfere with the conduct of the fair, impartial and equitable treatment of all bidders on this record. FAR section 1.602–2(b). In answering the charge to the contracting officer to safeguard the interests of the United States in its contractual relationships by maintaining, in appearance and in fact, a fair and open competition not marred by fraud or favoritism, the contracting officer under the current solicitation had the authority to withhold plaintiff's unit prices.

Thus, there is an overriding interest in fundamental fairness pursuant to 48 CFR § 1.602–2 that is concomitant with the "wide latitude to exercise business judgment" given to contracting officers. Therefore, the sole purpose of FAR section 1.602–2 is to provide a level playing-field for all bidders. What is more, defendant is well aware of its paramount duty, whereas here it has included the following statements in its own brief: "the subject procurement has been completely unbiased"; "all bidders have been treated equally"; "all bidders on equal ground"; "R & W is on a level playing field with all the other bidders." Def. Reply at 7–9. Unfortunately, on this record, defendant's words ring hollow.

Given the present posture of this case, *i.e.,* the fact that the unit prices of plaintiff are unfairly already in the hands of at least one of the bidders, 28 U.S.C. § 1491 gives the court broad discretion to fashion an appropriate remedy, including but not limited to injunctive relief. Therefore, the court requires such relief as is consistent with the contracting officer's responsibility under FAR section 1.602, to wit, to level the playing field, not just in words, but *in fact.* That upon the resolicitation of the new procurement, and not inconsistent with this opinion, (1) the unit prices of Flammann disclosed to SKE pursuant to FOIA must be disseminated to *all* other bidders, (2) plaintiff must also receive the comparable prices of *all* other bidders under the prior (January 2001) solicitation,[22] and (3) defendant must notify Facilma of a new re-solicitation and this court's ruling and extend to it the opportunity to again participate.

## PREJUDICE

■ Harmless error committed in the course of the procurement process is not sufficient grounds to warrant judicial intrusion to upset a procurement decision. *Day & Zimmermann,* 38 Fed.Cl. at 597 (citing 5 U.S.C. § 706(2)) (court must take into account the rule of prejudicial error). In order to establish a prejudicial error, a protestor is not required to show that but for the alleged error, the protestor would have been awarded the contract. *Id.* (citations omitted). Instead, a protestor must only show that, had it not been for the alleged error, there was a reasonable likelihood that it would have been awarded the contract. *Id.* (citations omitted).

■ Where the re-solicited contract is substantially similar to the incumbent contract, and plaintiff's prices were released as a direct result of the current solicitation, we

---

251902.5, Mar. 17, 1994, 94–1 CPD 201, 1994 WL 91072 (affirming that "the FOIA response provided to Peat Marwick gave that company a competitive advantage in the reopened competition").

**22.** Flammann stated that it submitted a FOIA request to the Army on April 22, 2002 to obtain the unit prices of its predecessor and, as of July 18, 2002, had not received them. Pl. Mot. for Prelim. Inj. at 3.

find that there is *prima facie* prejudice. Naturally an incumbent contractor enjoys the advantage of experience through its recent contract performance, and since no performance problems have been averred by defendant, it follows that plaintiff had a reasonable likelihood of contract award, but for the error alleged.

## PERMANENT INJUNCTION

### Standard of Proof

█ At this juncture in the proceedings, plaintiff's motion for preliminary injunction merges into its motion for permanent injunction. Accordingly, plaintiff must make three specific showings, by clear and convincing evidence, that it is entitled to the permanent injunctive relief which it seeks, to wit, (1) that it will suffer specific irreparable injury if the procurement is not enjoined; (2) that granting the relief serves the public interest, and (3) that the harm to be suffered by it if defendant prevails outweighs the harm to the government and third parties. *Day & Zimmermann*, 38 Fed. Cl. at 610 (citing *Washington Metro. Area Transit Comm'n v. Holiday Tours*, Inc., 559 F.2d 841, 842–43 (D.C.Cir.1977)).

### Analysis

█ (1) *Irreparable Injury:* Unquestionably, the current solicitation is tainted by the release of plaintiff's unit prices to its competitor SKE (see also fn. 9). Plaintiff has shown that it would suffer irreparable injury should an injunction not issue, as the "lost opportunity to compete in a fair competitive bidding process" is adequate proof under this element. *TRW Envtl. Safety Sys., Inc. v. United States*, 18 Cl.Ct. 33, 73 (1989). Absent injunctive relief, there is no other adequate remedy at law to cure the appearance of impropriety affecting all bidders under the current solicitation.

(2) *Public Interest:* The outcome of this court's opinion clearly has turned on the public interest, and the preservation of public confidence in the procurement process. Where SKE has sought and obtained an obvious competitive advantage over the other bidders, and another bidder, Facilma, has withdrawn its bid citing "unfair competition,"

the government cannot be content with proceeding under the current solicitation. Facilma may very well offer the government the most advantageous procurement, but that cannot be determined at the posture of this solicitation. Therefore, it would be in the best interest of the public, as well as the government, that the current solicitation be enjoined.

(3) *Harm Suffered by Plaintiff Outweighs Harm to Government and Third Parties:* Under these fact circumstances enumerated *supra*, the balance of harm is weighed against the plaintiff and third parties alike. While the Army can easily obtain temporary contracts until a new and fair solicitation can be had, all of the current bidders would be permanently deprived of a fair and equitable opportunity to secure contract award at present.

## CONCLUSION

Based upon all of the foregoing, the court hereby:

(1) GRANTS plaintiff's motion for summary judgment on the administrative record;

(2) DENIES defendant's motion for judgment on the administrative record;

(3) GRANTS plaintiff's motion for permanent injunction and declaratory judgment as follows:

° (i) The court hereby declares that Solicitation No. DAJA02–02–B–0001 is null and void, and is hereby cancelled, enjoined and set aside;

(ii) The Army, its officers, agents, servants, employees and representatives, and all persons acting in concert and participating with them respecting subject procurement, be and they are hereby PERMANENTLY RESTRAINED AND ENJOINED from proceeding with the opening of bids and awarding of a contract under Solicitation No. DAJA02–02–B–0001 which was unfairly and unlawfully administered for the provision of "between occupancy maintenance" (BOM,) services at U.S. Government housing facilities in Heidelberg, Germany;

(iii) The Army is hereby ordered and directed to cause the unit prices of Flam-

mann that were previously made available to SKE pursuant to FOIA be disseminated to all other bidders if a new solicitation covering the same or a reasonably similar Statement of Work as DAJA02–02–B–0001 and that the new solicitation be so structured as to eliminate the prejudicial effect of the exposure of plaintiff's unit price information respecting DAJA02–02–B–0001;

(iv) So as to "level the playing field," the Army shall also cause Flammann to receive the unit prices of all other bidders under Solicitation (DAJA02–01–D–0007); and

(v) The Army is hereby ordered to notify Facilma of the new solicitation, if any, and this court's ruling, and extend to it the opportunity to again participate.

Costs shall be awarded to plaintiff.

The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**